1  Susan Martin (AZ#014226)
2  Jennifer Kroll (AZ#019859)
   Martin & Bonnett, P.L.L.C.
3  4647 N. 32nd Street, Suite 185
   Phoenix, Arizona  85018
4  Telephone: (602) 240-6900
   Facsimile: (302) 777-0301
5  smartin@martinbonnett.com
6  jkroll@martinbonnett.com

7  *Counsel for Plaintiff*

8  [Additional Counsel on Signature Page]

9

10              **UNITED STATES DISTRICT COURT**
11                  **DISTRICT OF ARIZONA**

12  April Ruebsamen, derivatively on behalf of    Case No.
    AMMO, Inc.,
13                                                 **VERIFIED SHAREHOLDER**
14        Plaintiff,                               **DERIVATIVE COMPLAINT**

15        vs.
                                                   **JURY TRIAL DEMANDED**
16
    Fred W. Wagenhals; Jared R. Smith; Robert
17  D. Wiley; Russell William Wallace, Jr.;
    Richard Childress; Jessica Lockett; Steve F.
18  Urvan; Christos Tsentas; Wayne Walker;
    Randy Luth; Robert J. Goodmanson; and
19  Harry Markley,
20
          Defendants,
21
          and
22
23  AMMO, Inc.,

24        Nominal Defendant.

25

26

27        Plaintiff April Ruebsamen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

28  and on behalf of Nominal Defendant Ammo, Inc. ("Ammo" or the "Company"), files this Verified

---

Verified Shareholder Derivative Complaint

Shareholder Derivative Complaint against defendants Fred W. Wagenhals ("Wagenhals"), Jared R. Smith ("Smith"), Robert D. Wiley ("Wiley"), Russell William Wallace, Jr. ("Wallace"), Richard Childress ("Childress"), Jessica Lockett ("Lockett"), Steve F. Urvan ("Urvan"), Christos Tsentas ("Tsentas"), Wayne Walker ("Walker"), Randy Luth ("Luth"), Robert J. Goodmanson ("Goodmanson"), and Harry Markley ("Markley") (collectively, the "Individual Defendants," and together with Ammo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ammo, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and against Defendants Wagenhals, Smith, and Wiley for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ammo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ammo's directors and officers from August 19, 2020 through September 24, 2024, both dates inclusive (the "Relevant Period").

2.    Ammo is a Delaware-incorporated company that represents itself to be "a conglomerate of two premium positions in the shooting sports industry."[1] In its SEC filings, the

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1015383/000149315224023731/form10-k.htm

Company represents that it "started in ammunition manufacturing and broadened its portfolio with the acquisition of GunBroker.com ('GunBroker') in 2021."[2] GunBroker is an e-commerce marketplace ("Marketplace") that purportedly "connects buyers and sellers with new/used firearms and ancillary gear and componentry for the outdoor community" and "helps facilitate this community with a state and federal compliant solution that connects buyers with sellers across the United States ('U.S.') with their local federally licensed firearm dealers."[3] Ammo represents that "[t]he nature and operation of the Marketplace as an online auction and sales platform also affords [Ammo] a view into the total domestic market for the purpose of understanding sales trends at a granular level across all elements of the outdoor and sports shooting space."[4]

3.    The Company operates its business in two segments: (1) Ammunition, which consists of Ammo's manufacturing business and engages in the design, production and marketing of ammunition, ammunition components, and related products; and (2) Marketplace, which consists of the GunBroker e-commerce marketplace, purportedly designed to "support[] the lawful sale of firearms, ammunition, and hunting/shooting accessories."

4.    Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, financial success, and growth. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public which failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards

---

[2] *Id.*
[3] *Id.*
[4] *Id.*

Verified Shareholder Derivative Complaint

to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

5.    The truth fully emerged on September 24, 2024 when, after the market closed, the Company announced that Defendant Wiley had resigned as Ammo's CFO "at the request of the Board." Ammo also revealed that it had retained a law firm to conduct an independent investigation into whether the Company and its management control persons at the time: "(i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022."

6.    On this news, the Company's stock price fell $0.08 per share, or 5.26%, from a closing price of $1.52 per share on September 24, 2024 to close at a price of $1.44 per share on September 25, 2024.

7.    The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

8.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

9.    Moreover, during the Relevant Period, three of the Individual Defendants breached their fiduciary duties to Ammo by engaging in lucrative insider sales of Company common stock at artificially inflated prices while in possession of material nonpublic information, obtaining collective proceeds of over $1.5 million.

10.    Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase millions of shares of its own stock at prices

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that were artificially inflated due to the foregoing misrepresentations, causing the Company to overpay for its own common stock by approximately $960,884 in total.

11.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Arizona (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Wagenhal's, Defendant Smith's, and Defendant Wiley's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, their causing the Company to make the repurchases alleged herein, and their not being disinterested and/or independent directors, a majority of Ammo's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question

pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.    Plaintiff is a current shareholder of Ammo. Plaintiff has continuously held Ammo common stock since first purchasing the stock on November 30, 2020.

### Nominal Defendant Ammo

18.    Nominal Defendant Ammo is a Delaware corporation with its principal executive offices located at 7681 E. Gray Rd., Scottsdale, AZ 85260. Ammo shares trade on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "POWW."

### Defendant Wagenhals

19.    Defendant Wagenhals has served as Executive Chairman of the Board since July 24, 2023 and as Chairman of the Board since December 2016. He also served as the Company's CEO from December 2016 until July 24, 2023 and as the Company's President from December 2016 through March 2021.

20.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wagenhals made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-03-04 | 221,138 | 2.43 | 537,365 |
| 2024-02-29 | 5,699 | 2.40 | 13,677 |
| 2024-03-01 | 30,590 | 2.40 | 73,416 |
| 2024-02-16 | 11,343 | 2.50 | 28,357 |
| 2024-02-15 | 181,230 | 2.50 | 453,075 |

Thus, in total, before the fraud was exposed, he sold 450,000 shares of Company stock on inside information, for which he received approximately $1,105,890 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

21.    For the fiscal year ended March 31, 2023 ("2023 Fiscal Year"), Defendant Wagenhals received $1,817,698 in total compensation from the Company, which consisted of $475,000 in salary, $478,636 in bonus, $840,000 in stock awards, and $24,062 in all other compensation.

**Defendant Smith**

22.    Defendant Smith has served as the Company's CEO and President and as a Company director since July 2023 and previously served as the Company's COO from December 2016 to July 2023.

23.    For the 2023 Fiscal Year, Defendant Smith received $441,586 in total compensation from the Company, which consisted of $118,750 in salary, $118,750 in bonus, $175,000 in stock awards, and $29,086 in all other compensation.

**Defendant Wiley**

24.    Defendant Wiley served as the Company's CFO from 2019 until he resigned on September 19, 2024 at the request of the Board.

25.    For the 2023 Fiscal Year, Defendant Wiley received $605,084 in total compensation from the Company, which consisted of $240,000 in salary, $350,000 in stock awards, and $15,084 in all other compensation.

**Defendant Wallace**

26.    Defendant Wallace has served as a Company director since June 2017. He also serves as a member of the Audit Committee and the Compensation Committee.

27.    For the 2023 Fiscal Year, Defendant Wallace received $140,000 in total compensation from the Company, which consisted entirely of stock awards.

**Defendant Childress**

28.    Defendant Childress has served as a Company director since January 2021. He also serves as a member of the Audit Committee.

29.    For the 2023 Fiscal Year, Defendant Childress received $140,000 in total compensation from the Company, which consisted entirely of stock awards.

**Defendant Lockett**

30.    Defendant Lockett has served as a Company director since December 2020. She also serves as Chair of the Audit Committee and as a member of the Nominations and Corporate Governance Committee.

31.    For the 2023 Fiscal Year, Defendant Lockett received $188,000 in total compensation from the Company, which consisted of $48,000 in fees earned or paid in cash and $140,000 in stock awards.

**Defendant Urvan**

32.    Defendant Urvan has served as a Company director since April 2021.

33.    For the 2023 Fiscal Year, Defendant Urvan received $339,253 in total compensation from the Company, which consisted of $183,692 in fees earned or paid in cash, $140,000 in stock awards, and $15,561 in all other compensation.

**Defendant Tsentas**

34.    Defendant Tsentas has served as a Company director since November 2022. He also serves as a member of the Audit Committee.

35.    For the 2023 Fiscal Year, Defendant Tsentas received $17,500 in total compensation from the Company, which consisted entirely of stock awards.

**Defendant Walker**

36.     Defendant Walker has served as a Company director since November 2022. He also serves as a member of the Compensation Committee.

37.     For the 2023 Fiscal Year, Defendant Walker received $17,500 in total compensation from the Company, which consisted entirely of stock awards.

**Defendant Luth**

38.     Defendant Luth has served as a Company director since January 2023. He also serves as a member of the Compensation Committee and the Nominations and Corporate Governance Committee.

**Defendant Goodmanson**

39.     Defendant Goodmanson served as the Company's President and as a Company director from October 2019 through December 2022.

40.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Goodmanson made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2022-12-02 | 10,000 | 2.22 | 22,200 |
| 2021-09-15 | 10,000 | 6.33 | 63,300 |
| 2021-09-02 | 10,000 | 7.28 | 72,800 |

Thus, in total, before the fraud was exposed, he sold 30,000 shares of Company stock on inside information, for which he received approximately $158,300 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Markley**

41.     Defendant Markley served as a Company director from April 2018 through July 2023.

42.    For the 2023 Fiscal Year, Defendant Markley received $140,000 in total compensation from the Company, which consisted entirely of stock awards.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Markley made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2023-02-16 | 10,500 | 1.89 | 19,845 |
| 2022-08-19 | 25,000 | 4.37 | 109,250 |
| 2022-09-01 | 5,000 | 3.63 | 18,150 |
| 2022-08-19 | 25,000 | 4.37 | 109,250 |
| 2022-09-01 | 5,000 | 3.63 | 18,150 |

Thus, in total, before the fraud was exposed, he sold 70,500 shares of Company stock on inside information, for which he received approximately $274,645 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.    By reason of their positions as officers and/or directors of Ammo, and because of their ability to control the business and corporate affairs of Ammo, the Individual Defendants owed Ammo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ammo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ammo and its shareholders so as to benefit all shareholders equally.

45.    Each director and officer of the Company owes to Ammo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ammo, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

47.    To discharge their duties, the officers and directors of Ammo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ammo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

49.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

50.    To discharge their duties, the officers and directors of Ammo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Ammo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Ammo's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Ammo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Ammo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ammo's operations would comply with all applicable laws and Ammo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.    Each of the Individual Defendants further owed to Ammo and the shareholders the duty of loyalty requiring that each favor Ammo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Ammo and were at all times acting within the course and scope of such agency.

53.    Because of their advisory, executive, managerial, and directorial positions with Ammo, each of the Individual Defendants had access to adverse, non-public information about the Company.

54.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ammo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

56.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

57.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ammo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

58.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Ammo, and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements

#### *August 19, 2020 Form 10-K*

60.    The Relevant Period began on August 19, 2020 when Ammo filed its annual report on Form 10-K with the SEC for the fiscal year ended March 31, 2020 (the "2020 Fiscal Year"), (the "2020 10-K"), which was signed by Defendants Wagenhals, Goodmanson, Wallace, Luth, and Markley. The 2020 10-K discussed the composition and compensation of Ammo's executive officers and directors, as well as the valuation of Ammo's stock awards made to such individuals. In particular, the 2020 10-K stated the following, in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

* * *

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2020 | $ 120,000 | $     0 | $ 180,000 | $     0 | $     0 | $     0 | $     0 | $ 300,000 |
|  | 3/31/2019 | $ 120,000 | $     0 | $ 156,375 | $     0 | $     0 | $     0 | $     0 | $ 276,375 |
| Steve Hilko (4) Chief Operating Officer | 3/31/2020 | $ 120,000 | $     0 | $     0 | $     0 | $     0 | $     0 | $     0 | $ 120,000 |
|  | 3/31/2019 | $ 120,000 | $     0 | $     0 | $     0 | $     0 | $     0 | $     0 | $ 120,000 |
| Robert D. Wiley(5) Chief Financial Officer | 3/31/2020 | $ 103,333 | $     0 | $ 86,794 | $     0 | $     0 | $     0 | $     0 | $ 190,127 |
|  | 3/31/2019 | $  77,917 | $     0 | $ 76,395 | $     0 | $     0 | $     0 | $     0 | $ 154,312 |

## Director Compensation

***

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Robert J. Goodmanson (4) | $     0 | $ 80,000 | $     0 | $     0 | $     0 | $     0 | $ 80,000 |
| Russell William Wallace Jr. | $     0 | $ 80,000 | $     0 | $     0 | $     0 | $     0 | $ 80,000 |
| Randy Luth | $     0 | $ 80,000 | $     0 | $     0 | $     0 | $     0 | $ 80,000 |
| Harry Markley | $     0 | $ 80,000 | $     0 | $     0 | $     0 | $     0 | $ 80,000 |
| Dan O'Connor (5) | $     0 | $ 90,000 | $     0 | $     0 | $     0 | $     0 | $ 90,000 |
| Tom Jagemann (6) | $     0 | $ 20,000 | $     0 | $     0 | $     0 | $     0 | $ 20,000 |
| Kathy Hanrahan (7) | $     0 | $     0 | $     0 | $     0 | $     0 | $     0 | $     0 |

61.    The 2020 10-K contained information about Ammo's purported financial results, including its financing activities and the cost of certain payments related to such offerings. Specifically, the 2020 10-K stated the following, in relevant part:

| | For the Year Ended | |
|---|---|---|
| | March 31, 2020 | March 31, 2019 |
| Net Sales | $    14,780,365 | $    4,565,652 |
| Cost of Products Sold | 18,455,904 | 4,795,346 |
| Gross Margin | (3,675,539) | (229,694) |
| Sales, General & Administrative Expenses | 10,161,954 | 8,750,964 |
| Loss from Operations | (13,837,493) | (8,980,658) |
| Other income (expense) | | |
| Other income (expense) | (719,187) | (2,728,754) |
| Loss before provision for income taxes | $    (14,556,680) | $    (11,709,412) |
| Provision for income taxes | | - |
| Net Loss | $    (14,556,680) | $    (11,709,412) |

* * *

*Financing Activities*

---

15

Verified Shareholder Derivative Complaint

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540 generated from the sale of Common Stock, ***net of cash payments of $285,981 in conjunction with the Unit offerings.*** We issued $2,500,000 in Convertible Promissory Notes***, net of $329,000 of issuance costs.*** Additionally, $9,747,281 was generated from accounts receivable factoring, which was offset by ***payments of $7,741,302***. There was $819,731 of cash was generated from the issuance of a related party note payable, These increases to our financing activities were offset by ***payment of $1,885,000 on the related party notes payable***, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.[5]

62.    With respect to any off-balance sheet arrangements, the 2020 10-K represented that

the Company had none, stating:

**Off-Balance Sheet Arrangements**
As of March 31, 2020, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources

63.    With respect to Ammo's related party transactions, the 2020 10-K stated:

***Related Party Transactions***
From October 2016 through December 2018, our executive offices were located in Scottsdale, Arizona where we leased approximately 5,000 square feet under a month-to-month triple net lease for $3,800 per month. This space housed our principal executive, administration, and marketing functions. Our Chairman, President, and Chief Executive Officer owned the building in which these offices are currently leased. For the year ended March 31, 2020 and 2019, the Company paid $21,800 and $53,013, respectively in rent for these offices.

During the year ended March 31, 2020, we paid $184,575 in service fees to an independent contractor, $6,500 in consulting fees to our Previous Chief Financial Officer, and 60,000 shares in the aggregate to its Advisory Committee members for service for a total value of $113,000. Additionally, at March 31, 2020, the Company had a receivable of approximately, $14,700 from its previous Chief Financial Officer. During the year ended March 31, 2019, we paid approximately $168,000 in consulting fees.

---

[5] All emphasis has been added unless otherwise noted herein.

Verified Shareholder Derivative Complaint

In connection with the acquisition of the casing division of Jagemann Stamping Company, a promissory note was executed. The promissory note, under which $500,000 was paid on March 25, 2019 using funds raised for the acquisition, had a remaining balance at March 31, 2019 of $9,900,000. On April 30, 2019, the original due date of the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly until October 1, 2019 when the interest rate increases to 9% per annum payable monthly until principal and accrued interest are paid in full. In May of 2019, the Company paid $1,500,000 on the balance of the note. As of March 31, 2020 and March 31, 2019, we accrued interest of $352,157 and $22,196, respectively, related to the note.

In October of 2019, it was made apparent that certain equipment that was agreed to be delivered free and clear by the Seller was not achievable as Seller was not able to purchase equipment that Seller had leased. Accordingly, the remaining value of the promissory note was reduced by $2,596,200. As a result of the change to the purchase price of the transaction, the Company reduced Equipment for a net value of $1,871,306, decreased Other Intangible Assets by $766,068, increased Accounts Receivable by $31,924, and recorded an increase to Deposits for $9,250 worth of equipment that the Company agreed to transfer back to Seller. Consequently, accumulated amortization has decreased by $159,530.

Additionally, the Company entered into a lease to gain possession of the assets that were originally to be transferred. Subsequent to March 31, 2020, the Company, Enlight and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of the Company's common stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.

Through the Administrative and Management Services Agreement the Company with Jagemann Stamping Company, the Company purchased approximately $1.9M in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others, for the year ended March 31, 2020.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $278,195. The note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $315,000 in principal payments in the year ended March 31, 2020. We have accrued interest on the note of $9,080. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020 and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $156,536 and the amended maturity date is September 18, 2020. The Company made $70,000 in principal payments in the year ended March 31, 2020. The amended note bears interest at 1.25% per month. We have accrued interest on the note of $1,287. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

Other than the foregoing, none of the directors or executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year, or in any proposed transaction, which has materially affected or will affect the Company.

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested directors consent; and
- Obtaining shareholder consent where required.

***June 29, 2021 Form 10-K***

64.     On June 29, 2021, the Company submitted its annual report on Form 10-K with the SEC for the fiscal year ended March 31, 2021 (the "2021 10-K"), which was signed by Defendants Wagenhals, Wiley, Goodmanson, Wallace, Childress, Markley, Lockett, and Urvan and contained Sarbanes Oxley Act of 2002 ("SOX") certifications signed by Defendants Wagenhals and Wiley attesting to its accuracy. The 2021 10-K discussed the composition and compensation of Ammo's executive officers and directors, as well as the valuation of Ammo's stock awards made to such individuals. In particular, the 2021 10-K stated the following, in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**
* * *

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2021 | $240,000 | $96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $493,504 |
| | 3/31/2020 | $120,000 | $ 0 | $180,000 | $ 0 | $ 0 | $ 0 | $ 0 | $300,000 |
| Steve Hilko Chief Operating Officer(4) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $221,875 |
| | 3/31/2020 | $120,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $120,000 |
| Robert D. Wiley Chief Financial Officer | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $218,477 |
| | 3/31/2020 | $103,333 | $ 0 | $ 86,794 | $ 0 | $ 0 | $ 0 | $ 0 | $190,127 |

* * *

**Director Compensation**

* * *

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Harry Markley | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Robert J. Goodmanson | $ 90,400 | $ 70,000 | $ - | $ - | $ - | $ - | $160,400 |
| Jessica M. Lockett (4) | $ 12,000 | $ 17,500 | $ - | $ - | $ - | $ - | $ 29,500 |
| Richard R. Childress (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Randy E. Luth (6) | $ 0 | $ 52,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 52,500 |

65.    The 2021 10-K reported Ammo's purported financial results, including its financing activities and the cost of certain payments related to such offerings. In particular, the 2021 10-K stated:

|  | | For the Year Ended | | |
|---|---|---|---|---|
|  | | March 31, 2021 | | March 31, 2020 |
| Net Sales | $ | 62,482,330 | $ | 14,780,365 |
| Cost of Products Sold | | 51,095,679 | | 18,455,904 |
| Gross Margin | | 11,386,651 | | (3,675,539) |
| Sales, General & Administrative Expenses | | 16,766,636 | | 10,161,954 |
| Loss from Operations | | (5,379,985) | | (13,837,493) |
| Other income (expense) | | | | |
| Other income (expense) | | (2,432,309) | | (719,187) |
| Loss before provision for income taxes | $ | (7,812,294) | $ | (14,556,680) |
| Provision for income taxes | | - | | - |
| Net Loss | $ | (7,812,294) | $ | (14,556,680) |

* * *

### *Financing Activities*

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2021, net cash provided by financing activities was $139,276,235. This was the net effect of $138,612,619 generated from the sale of Common Stock, net of cash payments of $13,895,069 in conjunction with Common Stock offerings. Additionally, $40,309,292 was generated from accounts receivable factoring, ***which was offset by payments of $40,473,083***. There was $3,500,000 of cash generated from the issuance of a related party note payable. These increases to our financing activities were ***offset by payment of $8,783,410*** on the related party notes payable, $514,746 toward our insurance premium note payable and a $1,500,000 payment on the repurchase and cancellation of 1,000,000 shares of our Common Stock.

During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540 generated from the sale of Common Stock, net of cash payments of $285,981 in conjunction with the Unit offerings. We issued $2,500,000 in Convertible Promissory Notes, net of $329,000 of issuance costs. Additionally, $9,747,281 was generated from accounts receivable factoring, which was ***offset by payments of $7,741,302***. There was $819,731 of cash was generated from the issuance of a related party note payable. These increases to our financing activities were ***offset by payment of $1,885,000*** on the related party notes payable, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.

1

2      66.    With respect to off-balance sheet arrangements, the 2021 10-K represented that, as

3   of March 31, 2021, Ammo "*did not have any off-balance sheet arrangements* that have or are

4   reasonably likely to have a current or future material effect" on the Company's "financial

5   condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital

6   resources."

7      67.    The 2021 10-K contained a discussion of Ammo's related party transactions and

8   represented that "[o]ther than the foregoing" "none of the directors or executive officers of the

9   Company," "has any material interest, direct or indirect, in any transaction that has occurred

10  during the past fiscal year." In addition, the 2021 10-K stated that, "[w]ith regard to any future

11  related party transaction," Ammo "plan[s] to fully disclose any and all related party transactions."

12  The 2021 10-K also stated the following, in relevant part:

13
       ***Related Party Transactions***
14
15     During the year ended March 31, 2021, we paid $152,549 in service fees to an
       independent contractor and 60,000 shares in the aggregate to its advisory committee
16     members for service for a total value of $103,000.
                                    ***
17     In connection with the acquisition of the casing division of JSC, a promissory note
18     was executed. JSC owned at least five percent (5%) of our shares outstanding from
       March 2019 through March 16, 2021. On April 30, 2019, the note was subsequently
19     extended to April 1, 2020. The note bears interest per annum at approximately 4.6%
       payable in arrears monthly. On June 26, 2020, the Company extended the
20     promissory note until August 15, 2021. As of March 31, 2020, we accrued interest
21     of $352,157 related to the note. The note had a balance of $5,400,000 at March 31,
       2020 and the note was paid in full on November 5, 2020.
22                                  ***
23     Through the Administrative and Management Services Agreement the Company
       with JSC, the Company purchased approximately $3.4 million in inventory support
24     services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.
       For the year ended March 31, 2021, the Company purchased approximately $1.9
25     million in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of
26     expenses related to support costs such as engineering and maintenance, among
       others.
27
28

1
2
3

On June 26, 2021, the Company and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020.

4

***

5
6
7
8
9
10
11
12

On November 5, 2020, the Company paid $6,000,000 to JSC allocated as follows: (i) payment in full of Note A, representing the balance due from the Company to JSC relating to the acquisition of Jagemann Munition Components in March 2019 and (ii) $592,982 remitted in partial payment of Note B, resulting in the parties' execution of Amended Note B which has a starting principal balance of $1,687,664 ("Amended Note B"). The Amended Note B principal balance carries a 9% per annum interest rate and is amortized equally over the thirty-six (36) month term. As a result of the payment in full of Note A JSC shall release the accompanying security interest in Company assets which secured Note A. Concurrently, upon entry into Amended Note B, JSC and the Company entered into the First Amendment to General Business Security Agreement to reflect a revised list of collateral in which JSC has a security interest. The total interest expense recognized on Note A $216,160 for the year ended March 31, 2021. The total interest expense recognized on the original Note B was $62,876 for the year ended March 31, 2021.

13
14
15

The Company's balance of Amended Note B was $1,490,918 at March 31, 2021. The Company recognized $60,100 in interest expense on Amended Note B for the year ended March 31, 2021.

16
17

On January 22, 2021, the Company repurchased 1,000,000 shares of the Common Stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA and subsequently cancelled the total purchased shares.

18
19
20
21
22
23

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during year ended March 2021 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

24
25
26
27
28

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020, and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the amended maturity date is September 18, 2020. The Company made $25,000 in principal payments during the year ended March 31, 2021, and the Note was paid in full in July of 2020. The amended note bears interest at 1.25% per

month. We recognized $5,350 of interest expense on the note for the year ended March 31, 2021.

On September 23, 2020, the Company and Enlight entered into a promissory note (the "Forest Street Note") with Forest Street, LLC ("Lender"), an Arizona limited liability company wholly owned by our current Chief Executive Officer, Fred Wagenhals, for the principal sum of $3.5 million, which accrues interest at 12% per annum. The Note has a maturity date of September 23, 2022.

Pursuant to the terms of the Forest Street Note, the Company and Enlight (collectively, the borrower pursuant to the note) shall pay Lender; (i) on a monthly basis, beginning October 23, 2020, all accrued interest (only), (ii) on a quarterly basis, a monitoring fee of 1% of the principal amount and then accrued interest; and (iii) on the maturity date, the remaining outstanding principal balance of the Loan, together with all unpaid accrued interest thereon.

On December 14, 2020, the Company entered into a Debt Conversion Agreement with the Lender. Pursuant to the Agreement, the Company and Forest Street agreed to convert $2,100,000 of the Note's principal into 1,000,000 shares of the Common Stock. The share issuance occurred on December 15, 2020. As a result of the Debt Conversion Agreement the remaining balance of the Forest Street Note was $1,400,000. On January 14, 2021, the Company paid the remaining $1,400,000 in principal and accrued interest of the Forest Street Note. The Company recognized $137,666 in interest expense related to the Forest Street Note for the year ended March 31, 2021.

\*\*\*

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested director consent; and
- Obtaining shareholder consent where required.

**June 29, 2022 Form 10-K**

68.    On June 29, 2022, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended March 31, 2022 (the "2022 10-K"), which was signed by Defendants Wagenhals, Wiley, Goodmanson, Wallace, Childress, Markley, Lockett, and Urvan and contained SOX certifications signed by Defendants Wagenhals and Wiley attesting to its accuracy. The 2022 10-K discussed the composition and compensation of Ammo's executive officers and directors,

as well as the valuation of Ammo's stock awards made to such individuals. In particular, the 2022 10-K stated the following, in relevant part:

## ITEM 11 EXECUTIVE COMPENSATION

\* \* \*

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals Chief Executive Officer, and Director | 3/31/2022 | $298,750 | $572,463 | $481,250 | $ 0 | $ 0 | $ 0 | $ 0 | $1,352,463 |
|  | 3/31/2021 | $240,000 | $ 96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 3/31/2022 | $217,083 | $ 0 | $350,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 567,083 |
|  | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $ 218,477 |
| Robert J. Goodmanson (4) President | 3/31/2022 | $240,000 | $ 0 | $595,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer(5) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $ 221,875 |

\* \* \*

### Director Compensation

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Harry Markley | $ 0 | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Jessica M. Lockett | $ 48,000 | $140,000 | $ - | $ - | $ - | $ - | $188,000 |
| Richard R. Childress | $ - | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Steve Urvan (4) | $ - | $105,000 | $ - | $ - | $ - | $ - | $105,000 |

69.    The 2022 10-K reported Ammo's purported financial results, including its financing activities and the cost of certain payments related to such offerings. In particular, the 2022 10-K stated:

| | For the Year Ended | |
|---|---|---|
| | March 31, 2022 | March 31, 2021 |
| Net Sales | $ 240,269,166 | $ 62,482,330 |
| Cost of Revenues | 151,505,657 | 51,095,679 |
| Gross Margin | 88,763,509 | 11,386,651 |
| Sales, General & Administrative Expenses | 51,614,147 | 16,766,636 |
| Income (loss) from Operations | 37,149,362 | (5,379,985) |
| Other income (expense) | | |
| Other income (expense) | (615,957) | (2,432,309) |
| Income (loss) before provision for income taxes | $ 36,533,405 | $ (7,812,294) |
| Provision for income taxes | 3,285,969 | - |
| Net Income (Loss) | $ 33,247,436 | $ (7,812,294) |

\* \* \*

***Financing Activities:***

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs, approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by payments of approximately $122.8 million.

70.    With respect to off-balance sheet arrangements, the 2022 10-K represented that, as of March 31, 2022, Ammo "***did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect" on the Company's "financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources."

71.    The 2022 10-K contained a discussion of Ammo's related party transactions and represented that "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." In addition, the 2022 10-K stated that, "[w]ith regard to any future related party transaction," Ammo "plan[s] to fully disclose any and all related party transactions." The 2022 10-K also stated the following, in relevant part:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship.

\* \* \*

In connection with the acquisition of the casing division of JSC, a promissory note was executed. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2021, we accrued interest of $352,157 related to the note. The was paid in full on November 5, 2020. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021.

\* \* \*

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

\* \* \*

The Company's balance of Amended Note B was $865,771 and $1,490,918 at March 31, 2022 and 2021, respectively. The Company recognized $110,518 and $60,100 in interest expense on Amended Note B for the years ended March 31, 2022 and 2021, respectively.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Company's common stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during the nine months ended December, 2020 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

*2022 Proxy Statement*

72.     On November 22, 2022, Ammo filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

73.     The 2022 Proxy Statement solicited Company shareholders to, *inter alia*: (1) re-elect Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas to the Board; (2) ratify the appointment of Pannell Kerr Forster of Texas, P.C. as the Company's independent registered public accounting firm; (3) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; and (4) approve an amendment to the Ammo, Inc. 2017 Equity Incentive Plan (the "Plan") to increase the number of shares of common stock authorized for issuance under the Plan.

74.     With respect to the "Board's Role in Risk Oversight," the 2022 Proxy Statement stated:

> Our Board, directly and through its committees, has oversight responsibility for managing risk, and our management team is responsible for the Company's day-to-day enterprise risk management activities. To execute its responsibility for the day-to-day management of the risks we face, our management team works together with the leadership of the Company's operating subsidiaries to identify, review, assess and mitigate the material risks affecting our operations.
>
> Our Board of Directors is actively engaged in our business strategy and its oversight of risk management. Our Board regularly receives reports and input from senior management and outside advisors on areas of our material risk, including our operational, economic, financial, legal, regulatory and competitive risks, among others, and regularly devotes time during its meetings to an assessment of management's risk appetite, its responses to those risks and the mitigation of those risks. Our Board of Directors also reviews the various risks we identify in our filings with the SEC and risks relating to various strategic and business developments, such as acquisitions, debt and equity placements, and new service offerings.

27
Verified Shareholder Derivative Complaint

Our Board committees assist our Board of Directors in fulfilling its oversight role in certain areas of risk. Pursuant to its charter, the Audit Committee oversees the financial and reporting processes of our company and the audit of the financial statements of our company and provides assistance to our Board of Directors with respect to the oversight and integrity of the financial statements of our company, our company's compliance with legal and regulatory requirements, the independent registered public accountant's qualification and independence, and the performance of our independent registered public accountant. The Compensation Committee considers the risk of our compensation policies and practices and endeavors to ensure that it is not reasonably likely that our compensation plans and policies would have a material adverse effect on our company. Our Nominations and Corporate Governance Committee oversees governance related risk, such as board independence, conflicts of interests, and management and succession planning.

75.    With respect to the Code of Conduct, the 2022 Proxy Statement stated the following, in relevant part:

Our nominees are expected to comply with our Code of Conduct, which prohibits discrimination or harassment on the basis of race, color, religion, age, gender, sexual orientation, gender identity and expression, national origin, disability, marital status, citizenship status, veteran status, military status, or any other protected category under applicable law.

All of our directors have held high-level positions in business or professional service firms and have experience in dealing with complex issues. We believe that all of our directors are individuals of high character and integrity, are able to work well with others, and have committed to devote sufficient time to the business and affairs of our company. In addition to these attributes, the description of each director's background set forth above indicates the specific qualifications, skills, perspectives, and experience necessary to conclude that each individual should continue to serve as a director of our company.

***

In furtherance of its commitment to the principles of good corporate governance, our Board of Directors has adopted charters for the Audit, Compensation, and Nominations and Corporate Governance Committees describing the authority and responsibilities delegated to each committee by our Board of Directors. Our Board of Directors has also adopted Corporate Governance Guidelines, subject to periodic review by the Board of Directors and the Nominations and Corporate Governance Committee, a Code of Conduct, and a Code of Ethics for the CEO and Senior Financial Officers. Together, these governance documents, policies, and guidelines, in conjunction with our Certificate of Incorporation and Bylaws, form the framework for the governance of our company.

1
2
3
4
5
6

We post on our website, at https://investors.ammoinc.com/governance/governance-documents/default.aspx, the charters of our Audit, Compensation, and Nominations and Corporate Governance Committees; our Corporate Governance Guidelines, Code of Conduct, and Code of Ethics for the CEO and Senior Financial Officers, and any amendments or waivers thereto; and any other corporate governance materials specified by SEC regulations. These documents are also available in print to any shareholder requesting a copy in writing from our Secretary at the address of our executive offices.

7
8

76.    Regarding the proposal to amend the Plan, the 2022 Proxy Statement stated the following, in relevant part:

9
10
11
12

The Company is asking the shareholders to approve an amendment to the Ammo, Inc. 2017 Equity Incentive Plan (the "Plan"), the material terms of which are more fully described below. The Board of Directors approved the Amendment to the Plan on November 22, 2022, subject to the shareholder approval solicited by this proxy statement with such approval required by Nasdaq Listing Rule 5635(c).

13
14
15
16
17
18
19
20
21

In November 2017, the Board of Directors approved the Plan. Under the Plan, 485,000 shares of common stock were reserved and authorized to be issued. In August 2020 the Board approved, and in October 2020 our shareholders approved, an increase the total number of shares of our common stock available for issuance under the Plan to 5,000,000 shares. *The Board is now asking the shareholders to approve an increase the total number of shares of our common stock available for issuance under the Plan by one million (1,000,000) shares.* If this proposal is approved, the total number of shares that will be available for issuance under the Plan will be six million (6,000,000) shares. *The Board believes this increase will assist the Company and its affiliates in attracting, retaining and providing incentives to employees, directors, consultants and independent contractors who serve the Company and its affiliates by offering them the opportunity to acquire or increase their proprietary interest in the Company and to promote the identification of their interests with those of the shareholders of the Company.*

22
23
24

All terms of the Plan shall remain the same with the exception of the amount of shares reserved for issuance under the Plan which shall be increased by one million (1,000,000) shares. If this proposal is approved, the total number of shares that will be available for issuance under the Plan will be six million (6,000,000) shares.

25
26

*Description of the 2017 Plan*

27
28

The Plan permits the grant of Options, Restricted Stock, Restricted Stock Units ("RSUs") Performance Awards and Other Stock-Based Awards (each, an "Award"). The following summary of the material features of the Plan is entirely qualified by

29

reference to the full text of the Plan, a copy of which is attached hereto as Annex 1. Unless otherwise specified, capitalized terms used in this summary have the meanings assigned to them in the Plan.

*Eligibility*

All Employees, Officers, Directors, consultants and independent contractors of the Company and its Affiliates ("Eligible Persons") are eligible to receive grants of Awards under the Plan. As of September 30, 2022, the number of employees eligible to participate in the Plan was 308, there was one consultant or independent contractor eligible to participate in the Plan, and the number of non-employee directors eligible to participate in the Plan was six.

*Administration*

Except with respect to Awards granted to Non-Employee Directors, the Plan is administered by the Compensation Committee, and if no such committee exists then the Board (the "Committee"). With respect to Awards granted to Non-Employee Directors, the Board of Directors serves as the Committee, unless the Board of Directors appoints another committee or person(s) for such purpose. The Committee has plenary authority and discretion to determine the Eligible Persons to whom Awards are granted (each a "Participant") and the terms of all Awards under the Plan. Subject to the provisions of the Plan, the Committee has authority to interpret the Plan and agreements under the Plan and to make all other determinations relating to the administration of the Plan.

77.    Under the direction and watch of Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants'

positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

78.    The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

79.    As a result of Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 1,000,000 shares.

### June 14, 2023 Form 10-K

80.    On June 14, 2023, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended March 31, 2023 (the "2023 10-K"), which was signed by Defendants Wagenhals, Wiley, Wallace, Childress, Markley, Lockett, Walker, Tsentas, and Luth and contained SOX certifications signed by Defendants Wagenhals and Wiley attesting to its accuracy. The 2023 10-K reported Ammo's purported financial results, including its financing activities and the cost of certain payments related to such offerings. In particular, the 2023 10-K stated:

| | | For the Year Ended | |
|---|---|---|---|
| | | March 31, 2023 | March 31, 2022 |
| Net Sales | $ | 191,439,801 | $ 240,269,166 |
| Cost of Revenues | | 136,031,204 | 151,505,657 |
| Gross Margin | | 55,408,597 | 88,763,509 |
| Sales, General & Administrative Expenses | | 58,667,516 | 51,614,147 |
| Income (loss) from Operations | | (3,258,919) | 37,149,362 |
| Other income (expense) | | | |
| Other income (expense) | | (606,881) | (615,957) |
| Income (loss) before provision for income taxes | $ | (3,865,800) | $ 36,533,405 |
| Provision for income taxes | | 730,238 | 3,285,969 |
| Net Income (Loss) | $ | (4,596,038) | $ 33,247,436 |

\* \* \*

*Financing Activities*

During the year ended March 31, 2023, net cash used in financing activities was approximately $6.7 million. This was the result of approximately $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, $0.7 million in payments of our related party note payable, and an approximate $0.8 million reduction in our Inventory Credit Facility. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common stock. Additionally, approximately $71.3 million was generated from accounts receivable factoring, which was **offset by payments of approximately $72.3 million**.

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs, approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by **payments of approximately $122.8 million**.

81.    With respect to off-balance sheet arrangements, the 2023 10-K represented that, as of March 31, 2023, Ammo "**did not have any off-balance sheet arrangements** that have or are reasonably likely to have a current or future material effect" on the Company's "financial

condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources."

82.    The 2023 10-K contained a discussion of Ammo's related party transactions, stating:

**NOTE 16– RELATED PARTY TRANSACTIONS**

On November 3, 2022, AMMO, Inc. (the "Company") entered into a Settlement Agreement (the "Settlement Agreement") with Steven F. Urvan and Susan T. Lokey (collectively with each of their respective affiliates and associates, the "Urvan Group").

Pursuant to the Settlement Agreement, the Urvan Group has agreed to withdraw its notice of stockholder nomination of its seven director candidates (the "Urvan Candidates") and its demand to inspect books and records, pursuant to Section 220 of the General Corporation Law of the State of Delaware, and the Company agreed to immediately increase the size of the Board from seven to nine directors and appoint Christos Tsentas and Wayne Walker (each, a "New Director" and the New Directors together with Mr. Urvan, the "Urvan Group Directors") to the Board to serve as directors with terms expiring at the 2022 annual meeting of stockholders (the "2022 Annual Meeting"). The Company will include the Urvan Group Directors in its director candidates slate for the 2022 Annual Meeting and any subsequent annual meeting of stockholders of the Company occurring prior to the Termination Date (as defined below). The Company has agreed to not increase the size of the Board above nine directors prior to the Termination Date unless the increase is approved by at least seven directors. Mr. Wagenhals will continue to serve as a director and Chairman of the Board.

Unless otherwise mutually agreed to in writing by each party, the Settlement Agreement will remain in effect until the date that is the earlier of (i) 30 days prior to the earlier of (A) the deadline set forth in the notice requirements of Federal "Universal Proxy Rules" promulgated under Rule 14a-19(a) and Rule 14a-19(b) under the Securities Exchange Act of 1934, as amended (the "UPR Deadline") relating to the Company's 2023 annual meeting of stockholders (the "2023 Annual Meeting") and (B) any deadline that may be set forth in the Company's Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate") or Bylaws (the "Bylaws") following the execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2023 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2022 Annual Meeting (such date, the "Termination Date"). However, if the Company notifies Mr. Urvan in writing at least 15 days prior to such Termination

Date that the Board irrevocably offers to re-nominate the Urvan Group Directors for election at the 2023 Annual Meeting and Mr. Urvan accepts such offer within 15 days of receipt of such notice, the Termination Date will be automatically extended until the earlier of (i) 30 days prior to the earlier of (A) the UPR Deadline relating to the Company's 2024 annual meeting of stockholders (the "2024 Annual Meeting") and (B) any deadline that may be set forth in the Certificate or the Bylaws following execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2024 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2023 Annual Meeting. Notwithstanding the foregoing, the "Termination Date" shall not occur prior to 20 days after Mr. Urvan's departure from the Board.

Pursuant to the Settlement Agreement, the Company will suspend the previously announced separation of Company into Action Outdoor Sports, Inc. and Outdoor Online, Inc., pending the further evaluation of strategic options by the Board. The Company paid approximately $500,000 of the Urvan Group's costs, fees and expenses per the terms of the Settlement Agreement. Additionally, the Company issued 125,000 shares of Common Stock for a total value of $437,500 to an employee and issued 110,000 shares of Common Stock for a total value of $385,000 to an independent contractor as a result of termination without cause per the terms of the Settlement Agreement.

The foregoing summary of the Settlement Agreement does not purport to be complete and is subject to, and qualified in its entirety, by reference to the full text of the Settlement Agreement, a copy of which was previously filed as Exhibit 10.1 in the Form 8-K filed with the SEC on November 7, 2022, and incorporated herein by reference.

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of

Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

***

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

***

The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2023, 2022, and 2021, respectively.

### *July 31, 2023 Form 10-K/A*

83.    On July 31, 2023, the Company filed an amendment to its 2023 10-K on a Form 10-K/A with the SEC (the "Amended 2023 10-K"), which was signed by Defendants Smith and Wiley. The Amended 2023 10-K was filed to, *inter alia*, amend and restate disclosure of Ammo's directors, executive officers, and corporate governance, executive compensation, and certain relationships and related transactions. In addition, the Amended 2023 10-K discussed the composition and compensation of Ammo's executive officers and directors, as well as the valuation of Ammo's stock awards made to such individuals. In particular, the Amended 2023 10-K stated:

**ITEM 11 EXECUTIVE COMPENSATION**
* * *

| Name and Principal Position | Year | Salary (1) | Bonus (1) | Stock Awards (2) | All other compensation (3) | Total |
|---|---|---|---|---|---|---|
| Fred W. Wagenhals (4) Chief Executive Officer, and Director | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ 24,062 | $1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ 0 | $1,352,463 |
| | 2021 | $ 240,000 | $ 96,004 | $ 157,500 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 2023 | $ 240,000 | $ 0 | $ 350,000 | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ 0 | $ 350,000 | $ 0 | $ 567,083 |
| | 2021 | $ 127,500 | $ 0 | $ 90,977 | $ 0 | $ 218,477 |
| Jared R. Smith (5) President and Chief Operating Officer | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ 29,086 | $ 441,586 |
| Robert J. Goodmanson (6) President | 2023 | $ 180,000 | 0 | $ 446,250 | $ 84,973 | 711,223 |
| | 2022 | $ 240,000 | $ 0 | $ 595,000 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer (7) | 2021 | $ 163,542 | $ 0 | $ 58,333 | $ 0 | $ 221,875 |

\* \* \*

**Director Compensation**

\* \* \*

| Name | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards | Nonequity incentive plan compensation | Change in Pension Value and Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Harry Markley | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Jessica M. Lockett | $ 48,000 | $ 140,000 | $ - | $ - | $ - | $ - | $ 188,000 |
| Richard R. Childress | $ - | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Steve Urvan (3) | $ 183,692 | $ 140,000 | $ - | $ - | $ - | $ 15,561 | $ 339,253 |
| Wayne Walker (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Christos Tsentas (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Randy E. Luth (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

84.     With respect to Ammo's related party transactions, the Amended 2023 10-K stated

the following, in relevant part:

The following is a description of each transaction since April 1, 2022 and each
currently proposed transaction in which:
● we have been or are to be a participant;
● the amount involved exceeds $120,000; and
● any related person had or will have a direct or indirect material interest.

*While the Company does not current have a written policy regarding approval of transactions between the Company and a related party, our Board of Directors, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations.* Generally, management would present to the Board of Directors for approval at the next regularly scheduled Board of Directors meeting any related party transactions proposed to be entered into by us. *The Board of Directors may approve the transaction if it is deemed to be in the best interests of our shareholders and the Company.*

\* \* \*

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967. We issued 45,000 shares in the aggregate to our advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created with Mr. Urvan by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

**2023 Proxy Statement**

85.     On November 29, 2023, Ammo filed a Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

86.     The 2023 Proxy Statement solicited Company shareholders to, *inter alia*: (1) re-elect Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth to the Board; (2) ratify the appointment of Pannell Kerr Forster of Texas, P.C. as the Company's independent registered public accounting firm for the fiscal year ending March 31, 2024; and (3) approve an amendment to the Plan to increase the number of shares of common stock authorized for issuance under the Plan.

87.    With respect to the "Board's Role in Risk Oversight," the 2023 Proxy Statement stated:

> Risk is inherent in every business. As is the case in virtually all businesses, we face a number of risks, including operational, economic, financial, legal, regulatory, and competitive risks. Our management is responsible for the day-to-day management of the risks we face. The Board, as a whole and through its committees, has responsibility for the oversight of risk management.
>
> In its oversight role, the Board's involvement in our business strategy and strategic plans plays a key role in its oversight of risk management, its assessment of management's risk appetite, and its determination of the appropriate level of enterprise risk. The Board receives updates at least quarterly from senior management and periodically from outside advisors regarding the various risks that we face, including operational, economic, financial, legal, regulatory, and competitive risks. The Board also reviews the various risks that we identify in our filings with the SEC and risks relating to various specific developments, such as acquisitions, debt and equity placements, and new service offerings.
>
> The Board committees assist the Board in fulfilling its oversight role in certain areas of risk. Pursuant to its charter, the Audit Committee oversees the Company's financial and reporting processes and the audit of the Company's financial statements and provides assistance to the Board with respect to the oversight and integrity of the Company's financial statements and compliance with legal and regulatory requirements, the independent registered public accounting firm's qualification and independence, and the performance of our independent registered public accounting firm. The Compensation Committee considers the risk of our compensation policies and practices and endeavors to ensure that it is not reasonably likely that our compensation plans and policies would have a material adverse effect on the Company. The Nominations and Corporate Governance Committee oversees governance related risk, such as board independence, conflicts of interests, and management and succession planning.

88.    With respect to the Code of Conduct, the 2023 Proxy Statement stated:

> The Board has adopted charters for the Audit, Compensation, and Nominations and Corporate Governance Committees describing the authority and responsibilities delegated to each committee by the Board. The Board has also adopted Corporate Governance Guidelines, a Code of Conduct applicable to all of our employees and directors, and a Code of Ethics applicable to the Chief Executive Officer and senior financial officers, including our Chief Financial Officer and principal accounting officer.

We post on our website, at https://investors.ammoinc.com/governance/governance-documents/default.aspx, the charters of our Audit, Compensation, and Nominations and Corporate Governance Committees, our Corporate Governance Guidelines, Code of Conduct, and Code of Ethics for the Chief Executive Officer and Senior Financial Officers, and any amendments or waivers thereto, and any other corporate governance materials specified by SEC regulations. These documents are also available in print to any shareholder requesting a copy in writing from our Secretary at the address of our executive offices.

89.    With respect to the proposal to amend the Plan, the 2023 Proxy Statement stated:

The Company is asking the shareholders to approve an amendment to the Ammo, Inc. 2017 Equity Incentive Plan (the "Plan"), the material terms of which are more fully described below. The Board approved the Amendment to the Plan on November 27, 2023, subject to the shareholder approval solicited by this Proxy Statement with such approval required by Nasdaq Listing Rule 5635(c).

In November 2017, the Board approved the Plan. Under the Plan, 485,000 shares of Common Stock were reserved and authorized to be issued. In August 2020 the Board approved, and in October 2020 our shareholders approved, an increase the total number of shares of Common Stock available for issuance under the Plan to 5,000,000 shares. In November 2022 the Board approved, and in January 2023 our shareholders approved, an increase the total number of shares of Common Stock available for issuance under the Plan to 6,000,000 shares. The Board is now asking the shareholders to approve an increase the total number of shares of Common Stock available for issuance under the Plan by 3,000,000 shares. If this proposal is approved, the total number of shares that will be available for issuance under the Plan will be 9,000,000 shares. The Board believes this increase will assist the Company and its affiliates in attracting, retaining and providing incentives to employees, directors, consultants and independent contractors who serve the Company and its affiliates by offering them the opportunity to acquire or increase their proprietary interest in the Company and to promote the identification of their interests with those of the shareholders of the Company.

All other terms of the Plan shall remain the same with the exception of the amount of shares of Common Stock reserved for issuance under the Plan which shall be increased by 3,000,000 shares. If this proposal is approved, the total number of shares that will be available for issuance under the Plan will be 9,000,000 shares.

*Description of the Plan*

The Plan permits the grant of Options and Stock Awards (each, an "Award"). The following summary of the material features of the Plan, as proposed to be amended, is entirely qualified by reference to the full text of the Plan as proposed to be

amended, a copy of which is attached hereto as Appendix 1. Unless otherwise specified, capitalized terms used in this summary have the meanings assigned to them in the Plan.

*Eligibility*

All Employees, Officers, Directors, consultants and independent contractors of the Company and its Affiliates ("Eligible Persons") are eligible to receive grants of Awards under the Plan. As of November 29, 2023, the number of employees eligible to participate in the Plan was 308, there was no consultant or independent contractor eligible to participate in the Plan, and the number of non-employee directors eligible to participate in the Plan was seven.

*Administration*

The Plan is administered by the Compensation Committee, and if no such committee exists then the Board (the "Committee"). The Committee has plenary authority and discretion to determine the Eligible Persons to whom Awards are granted (each a "Participant") and the terms of all Awards under the Plan. Subject to the provisions of the Plan, the Committee has authority to interpret the Plan and agreements under the Plan and to make all other determinations relating to the administration of the Plan.

90.     Under the direction and watch of Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants' positive

Verified Shareholder Derivative Complaint

statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

91.    The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92.    As a result of Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 3,000,000 shares.

**June 13, 2024 Form 10-K**

93.    On June 13, 2024, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended March 31, 2024 (the "2024 10-K"), which was signed by Defendants Smith, Wiley, Wagenhals, Wallace, Childress, Lockett, Urvan, Walker, Tsentas, and Luth and contained SOX certifications signed by Defendants Smith and Wiley attesting to its accuracy. The 2024 10-K reported Ammo's purported financial results, including its financing activities and the

cost of certain payments related to such offerings. In particular, the 2024 10-K stated the following, in relevant part:

| | For the Year Ended | |
|---|---|---|
| | March 31, 2024 | March 31, 2023 |
| Net Revenues | $ 145,054,572 | $ 191,439,801 |
| Cost of Revenues | 102,431,803 | 136,031,204 |
| Gross Margin | 42,622,769 | 55,408,597 |
| Sales, general & administrative expenses | 61,199,966 | 58,667,516 |
| Income (loss) from Operations | (18,577,197) | (3,258,919) |
| Other income (expense) | | |
| Other income (expense) | (779,066) | (606,881) |
| Income (loss) before provision for income taxes | $ (19,356,263) | $ (3,865,800) |
| Provision for income taxes | (3,791,063) | 730,238 |
| Net Income (Loss) | $ (15,565,200) | $ (4,596,038) |

\* \* \*

***Financing Activities***

During the year ended March 31, 2024, net cash used in financing activities was $8.7 million, consisting of $3.2 million of insurance premium note payments, $3.0 million of preferred stock dividends paid, $2.2 million used to repurchase shares of Common Stock pursuant to our repurchase plan, and $0.2 million in payments of our related party note payable. These items were offset by $0.1 million of proceeds from warrants exercised for common stock. Additionally, $37.3 million was generated from accounts receivable factoring, which was offset by payments of $37.3 million.

During the year ended March 31, 2023, net cash used in financing activities was $6.7 million, consisting of $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, an $0.8 million reduction in our Inventory Credit Facility, and $0.7 million in payments of our related party note payable. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common stock. Additionally, approximately $71.3 million was generated from accounts receivable factoring, which was offset by payments of approximately $72.3 million.

94.    With respect to off-balance sheet arrangements, the 2024 10-K represented that, as of March 31, 2024, Ammo "***did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect" on the Company's "financial

condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources."

95.    With respect to Ammo's related party transactions, the 2024 10-K stated the following, in relevant part:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors consisting of a $244,640 payment due upon termination without cause. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which consisted of an issuance of 134,240 shares due upon termination without cause. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 as a result of this relationship. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

On July 24, 2023, Fred Wagenhals departed as CEO and the Board appointed Mr. Wagenhals the Company's Executive Chairman. Mr. Wagenhals remains a member of the Board. Mr. Wagenhals received the following payments in connection with his transition from CEO to Executive Chairman: (i) total cash payments of $1,060,290; (ii) 300,000 shares of Common Stock for a total value of $624,000.

On July 26, 2023, we obtained a $1.6 million letter of credit with Northern Trust for collateral for a bond related to a judgement assessed to GunBroker. On July 17, 2023, we generated a $1.6 million certificate of deposit with Northern Trust for security on the letter of credit. The term of the certificate of deposit is twelve months and includes interest of approximately 5%. Per the terms of the Merger Agreement, filed with the Commission on a Current Report on Form 8-K on May 6, 2021 (the "Current Report"), the Seller is required to pay or be liable for these losses (capitalized terms are defined the Current Report).

In July of 2023, the Company filed suit in the Delaware Chancery Court against Director and Shareholder Steve Urvan for claims arising out of the Company's acquisition of certain companies referenced as the GunBroker family of companies. The claims arise based upon Mr. Urvan's repeated failure and refusal to honor contractual defense and indemnification obligations arising under that certain Merger Agreement, along with alleged misrepresentations.

* * *

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and we issued 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

\* \* \*

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022.

\* \* \*

The Company paid off the balance of Amended Note B during the year ended March 31, 2024. The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $1,788, $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2024, 2023, and 2022, respectively.

### *July 29, 2024 Form 10-K/A*

96.     On July 29, 2024, the Company filed an amendment to its 2024 10-K on a Form 10-K/A with the SEC (the "Amended 2024 10-K"), which was signed by Defendants Smith and Wiley. The Amended 2024 10-K was filed to, *inter alia*, amend and restate disclosure of Ammo's

directors, executive officers, and corporate governance, executive compensation, and certain relationships and related transactions. In addition, the Amended 2024 10-K discussed the composition and compensation of Ammo's executive officers and directors, as well as the valuation of Ammo's stock awards made to such individuals. In particular, the Amended 2024 10-K stated:

### ITEM 11 EXECUTIVE COMPENSATION
* * *

| Name and principal position | Year | Salary ($)(1) | Bonus ($)(1) | Stock awards ($)(2) | Option awards ($)(3) | All other compensation (4) | Total |
|---|---|---|---|---|---|---|---|
| Jared R. Smith (6) CEO, and Director | 2024 | $ 492,215 | $ - | $ 425,800 | $ 430,457 | $ 33,943 | $ 1,382,415 |
| | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ - | $ 29,086 | $ 441,586 |
| Robert D. Wiley CFO | 2024 | $ 310,833 | $ 129,000 | $ 225,000 | $ - | $ 14,567 | $ 679,400 |
| | 2023 | $ 240,000 | $ - | $ 350,000 | $ - | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ - | $ 350,000 | $ - | $ - | $ 567,083 |
| Fred W. Wagenhals (5)(7) Chairman of the Board of Directors, Executive Chair | 2024 | $ 423,270 | $ 85,438 | $ 1,129,650 | $ - | $ 1,079,508 | $ 2,717,866 |
| | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ - | $ 24,062 | $ 1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ - | $ - | $ 1,352,463 |
| Anthony Tate Vice President of Sales & Marketing | 2024 | $ 246,566 | $ 62,000 | $ 206,250 | $ - | $ - | $ 514,816 |
| Beth Cross Chief Operating Officer, GunBroker | 2024 | $ 250,000 | $ 62,000 | $ 168,750 | $ - | $ 25,979 | $ 506,729 |
| Tod Wagenhals Executive Vice President, Secretary | 2024 | $ 230,000 | $ - | $ 203,000 | $ - | $ 18,517 | $ 451,517 |

* * *

### Director Compensation

| Name and Principal Position | Fees earned or paid in cash ($)(1) | Stock awards ($)(2)(3) | Option awards ($) | Total ($) |
|---|---|---|---|---|
| Russell William Wallace Jr. | $ - | $ 90,000 | $ - | $ 90,000 |
| Jessica M. Lockett (5) | $ 48,000 | $ 90,000 | $ - | $ 138,000 |
| Richard R. Childress | $ - | $ 90,000 | $ - | $ 90,000 |
| Steve Urvan | $ - | $ 90,000 | $ - | $ 90,000 |
| Wayne Walker | $ - | $ 101,351 | $ - | $ 101,351 |
| Christos Tsentas | $ - | $ 101,351 | $ - | $ 101,351 |
| Randy E. Luth | $ - | $ 109,875 | $ - | $ 109,875 |
| Harry S. Markley(4) | $ - | $ 26,725 | $ - | $ 26,725 |

97.     With respect to Ammo's related party transactions, the Amended 2024 10-K stated

the following, in relevant part:

**Related Party Transactions**

Our Related Party Transactions Policy provides guidance for addressing actual or potential conflicts of interests, including those that may arise from transactions and relationships between us and our executive officers or directors. The Audit Committee and Board, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations. Generally, management would present to the Board for approval at the next regularly scheduled Board meeting any related party transactions proposed to be entered into by us. The Audit Committee and Board may approve the transaction if it is deemed to be in the best interests of the Company.

The following is a description of each transaction since April 1, 2023 and each currently proposed transaction in which:

● we have been or are to be a participant;
● the amount involved exceeds $120,000; and
● any related person had or will have a direct or indirect material interest.

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors, who provided services to the company, which included a $244,640 payment due upon termination without cause to one of the independent contractors. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which included an issuance of 134,240 shares due upon termination without cause for one of the independent contractors. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250.

Through our acquisition of Gemini Direct Investments, LLC ("Gemini"), a related party relationship was created through one of our directors, Mr. Steve Urvan, by his ownership of entities that provided services to Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 from entities owned by Mr. Urvan.

The Company paid off the balance of a promissory note to Jagemann Stamping Company ("JSC") during the year ended March 31, 2024. JSC became a shareholder of the Company through the Company's acquisition of JSC's brass casing division. The payment made to JSC during fiscal 2024 consisted of $181,132 in principal and $2,784 in interest on the note. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

98.     The statements referenced in ¶¶60-71, 80-84, and 93-97 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

99.     The truth fully emerged on September 24, 2024 when, after the market closed, the Company announced that Defendant Wiley had resigned as Ammo's CFO "at the request of the Board." Ammo also revealed that it was performing an independent investigation into its "internal control over financial reporting for the fiscal years 2020 through 2023." In particular, the Company filed a Form 8-K with the SEC which revealed the following:

*Resignation of Mr. Rob Wiley as Chief Financial Officer*

1

2    On September 19, 2024, the Company received a notice of resignation from its Chief
3    Financial Officer, Rob Wiley, effective September 20, 2024. ***Mr. Wiley resigned***
     ***upon request by the Board.*** Pursuant to a recommendation by the Compensation
4    Committee, the Board exercised its discretion to approve a separation agreement
5    ("Separation Agreement") for Mr. Wiley. Mr. Wiley signed the Separation
     Agreement on September 19, 2024. Pursuant to the Separation Agreement, Mr.
6    Wiley will be entitled to separation compensation in the amount of $406,250.00
7    paid in equal bi-monthly installments over fifteen calendar months; fifty thousand
     shares of common stock; a lump sum payment for accrued and unused vacation and
8    paid time off; family health benefits under the Company's employer sponsored
9    plans until September 30, 2025; and unreimbursed expenses. Mr. Wiley gave the
     Company a general liability release, and the Parties agreed to several standard
10   restrictive covenants. Additionally, the Separation Agreement requires Mr. Wiley
11   to provide cooperation and assistance to the Company to facilitate the transfer of
     duties to his successor.

12   ***Independent Investigation***

13   ***A Special Committee of the Board of Directors has retained a law firm to conduct***
14   ***an independent investigation, focused on fiscal years 2020 through 2023,***
     ***including determining whether the Company and its management control persons***
15   ***at the time: (i) accurately disclosed all executive officers, members of***
16   ***management, and potential related party transactions in fiscal years 2020 through***
     ***2023; (ii) properly characterized certain fees paid for investor relations and legal***
17   ***services as reductions of proceeds from capital raises rather than period expenses***
18   ***in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock***
     ***awards to officers, directors, employees and others in fiscal years 2020 through***
19   ***2022***. The Company's outside auditors have indicated that ***they are not prepared to***
20   ***rely on representations from the Company's management team from the period***
     ***in question*** until such time that the aforementioned investigation and all appropriate
21   remediation, if necessary, is completed. This independent investigation is in its early
22   stages, and to ensure the fairness of that process, the Company does not plan further
     comment pending completion of the investigation.

23        100.   On this news, the Company's stock price fell $0.08 per share, or 5.26%, from a

24   closing price of $1.52 per share on September 24, 2024 to close at a price of $1.44 per share on

25   September 25, 2024.

26                        **REPURCHASES DURING THE RELEVANT PERIOD**
27

28

                                            48

101.  During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In particular, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, as follows:

| Month | Units | Share Price ($) | Total Cost ($) | Harm to the Company ($)[6] |
|---|---|---|---|---|
| December 2022 | 150,000 | 1.92 | 288,000 | 72,000 |
| March 2023 | 118,328 | 1.93 | 228,373 | 57,981 |
| April 2023 | 609,509 | 1.95 | 1,188,543 | 310,850 |
| May 2023 | 129,322 | 1.95 | 252,178 | 65,954 |
| August 2023 | 158,542 | 1.99 | 315,499 | 87,198 |
| September 2023 | 39,256 | 2.00 | 78,512 | 21,983 |
| November 2023 | 11,000 | 2.00 | 22,000 | 6,160 |
| December 2023 | 134,483 | 2.02 | 271,656 | 78,000 |
| June 2024 | 579,463 | 1.89 | 1,095,185 | 260,758 |
| **TOTAL** | **1,929,903** | **--** | **3,739,945** | **$960,884** |

102.  Indeed, the Individual Defendants, while in positions of control and influence and in possession of material non-public information, caused the Company to repurchase its own common stock at artificially inflated prices, which caused the Company to overpay for its own common stock by approximately $960,884.

## DAMAGES TO AMMO

103.  As a direct and proximate result of the Individual Defendants' conduct, Ammo has lost and expended, and will continue to lose and expend, many millions of dollars.

104.  Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

105.  Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the

---

[6] "Harm to the Company" refers to how much the Company overpaid for its own common stock by repurchasing it at artificially inflated prices and is calculated by subtracting what the Company should have paid for its stock (at $1.44 per share, as it was when the truth was revealed) from the "Total Cost," *i.e.*, what the Company actually paid for its common stock.

Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.    Such losses include the Company's overpayment of $960,884 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to Defendants' false and misleading statements discussed above.

107.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

108.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

109.    As a direct and proximate result of the Individual Defendants' conduct, Ammo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

110.    Plaintiff brings this action derivatively and for the benefit of Ammo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ammo, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 20(a), 10(b) (and Rule 10b-5 promulgated thereunder), and 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

111.    Ammo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.    Plaintiff is, and has been at all relevant times, a shareholder of Ammo. Plaintiff will adequately and fairly represent the interests of Ammo in enforcing and prosecuting its rights, and,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

113.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

114.    A pre-suit demand on the Board of Ammo is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Smith, Wagenhals, Wallace, Lockett, Childress, Urvan, Tsentas, Luth, and Walker (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director Defendants who are on the Board at the time this action is commenced.

115.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to overpay for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to Defendants' false and misleading statements. All of the above renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

116.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Ammo to issue materially false and misleading statements. Specifically, the Director Defendants caused Ammo to issue false and misleading statements which were intended to make Ammo appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

117.    Additional reasons that demand on the Director Defendants is futile follow. Defendants Wagenhals, Wallace, Lockett, Childress, Urvan, Walker, and Tsentas solicited the

false and misleading 2022 Proxy Statement, which led Company shareholders to, *inter alia*, approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 1,000,000 shares and allowing the Director Defendants to receive material benefits thereunder in the future. The Director Defendants are unlikely to take action against those among them that solicited the 2022 Proxy Statement since its issuance caused shareholders to approve the amendment to the Plan, and since the Director Defendants now have the opportunity to materially benefit therefrom in the future. The Director Defendants are unlikely to call into question any benefits received pursuant to the issuance of the 2022 Proxy Statement, thus making demand against them futile.

118.    Additional reasons that demand on the Director Defendants is futile follow. Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth solicited the false and misleading 2023 Proxy Statement, which led Company shareholders to, *inter alia*, approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 3,000,000 shares and allowing the Director Defendants to receive material benefits thereunder in the future. The Director Defendants are unlikely to take action against those among them that solicited the 2023 Proxy Statement since its issuance caused shareholders to approve the amendment to the Plan, and since the Director Defendants now have the opportunity to materially benefit therefrom in the future. The Director Defendants are unlikely to call into question any benefits received pursuant to the issuance of the 2023 Proxy Statement, thus making demand against them futile.

119.    Additional reasons that demand on Defendant Wagenhals is futile follow. Defendant Wagenhals has served as Executive Chairman of the Board since July 24, 2023 and as Chairman of the Board since December 2016. He also served as the Company's CEO from December 2016 until July 24, 2023 and as the Company's President from December 2016 through March 2021. Defendant Wagenhals has received and continues to receive handsome compensation for his role as a director as noted above. Thus, as the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement

in the Individual Defendants' scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wagenhals solicited the 2022 and 2023 Proxy Statements, which contained material misrepresentations and omissions and contributed to, *inter alia*, (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Wagenhals also signed the false and misleading 2020, 2021, 2022, 2023, and 2024 10-Ks. In addition, Defendant Wagenhals is named as a defendant in the Securities Class Action. Also, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant Wagenhals breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as the Company's CEO and President and as a Company director since July 2023 and previously served as the Company's COO from December 2016 to July 2023. As such, the Company provides Defendant Smith with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As Ammo's CEO and as one of its trusted directors, Defendant Smith was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally made. As a trusted Company director, Defendant Smith conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Smith solicited the 2023 Proxy

1
2
3
4
5
6
7
8

Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo, and the approval of the amendment to the Plan, thereby increasing the issuance of shares available thereunder by 3,000,000. Defendant Smith also signed the false and misleading Amended 2023, 2024, and Amended 2024 10-Ks. Moreover, Defendant Smith is named as a defendant in the Securities Class Action. For these reasons, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

121.    Additional reasons that demand on Defendant Luth is futile follow. Defendant Luth has served as a Company director since January 2023. He also serves as a member of the Compensation Committee and the Nominations and Corporate Governance Committee. Defendant Luth has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Luth solicited the 2023 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo, and the approval of the amendment to the Plan, thereby increasing the issuance of shares available thereunder by 3,000,000. Defendant Luth also signed the false and misleading 2020, 2023, and 2024 10-Ks. For these reasons, Defendant Luth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

24
25
26
27
28

122.    Additional reasons that demand on Defendant Wallace is futile follow. Defendant Wallace has served as a Company director since June 2017. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Wallace has received and continues to receive lucrative compensation for his role as a director as described above. As a

trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Wallace solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Wallace also signed the false and misleading 2020, 2021, 2022, 2023, and 2024 10-Ks. For these reasons, Defendant Wallace breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Childress is futile follow. Defendant Childress has served as a Company director since January 2021. He also serves as a member of the Audit Committee. Defendant Childress has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Childress solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Childress also signed the false and misleading 2021, 2022, 2023, and 2024 10-Ks. For these reasons, Defendant Childress breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him

is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Urvan is futile follow. Defendant Urvan has served as a Company director since April 2021. Defendant Urvan has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Urvan solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Urvan also signed the false and misleading 2021, 2022, and 2024 10-Ks. For these reasons, Defendant Urvan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Tsentas is futile follow. Defendant Tsentas has served as a Company director since November 2022. He also serves as a member of the Audit Committee. Defendant Tsentas has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Tsentas solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available

thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Tsentas also signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Tsentas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.     Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since November 2022. He also serves as a member of the Compensation Committee. Defendant Walker has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Walker solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Walker also signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.     Additional reasons that demand on Defendant Lockett is futile follow. Defendant Lockett has served as a Company director since December 2020. She also serves as Chair of the Audit Committee and as a member of the Nominations and Corporate Governance Committee. Defendant Lockett has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Lockett solicited the 2022 and 2023 Proxy Statements, which contained false and misleading statements and resulted in, *inter alia*: (1) the re-election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Ammo; and (2) the approval of the amendments to the Plan, thereby increasing the issuance of shares available thereunder by 1,000,000 (per the 2022 Proxy Statement) and 3,000,000 (per the 2023 Proxy Statement). Defendant Lockett also signed the false and misleading 2021, 2022, 2023, and 2024 10-Ks. For these reasons, Defendant Lockett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128.    Additional reasons that demand on the Board is futile follow.

129.    Defendants Lockett (as Chair), Wallace, Childress, and Tsentas (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to make false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

130.    In violation of the Code of Conduct, the Director Defendants engaged in or

permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

131. Ammo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ammo any part of the damages Ammo suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

132. The acts complained of herein constitute violations of fiduciary duties owed by Ammo's officers and directors, and these acts are incapable of ratification.

133. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

134. The Director Defendants may also be protected against personal liability for their

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ammo. If there is a directors' and officers' liability insurance policy covering Company directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against Company directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Ammo, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

135.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Ammo to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

136.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

139.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

140.   Under the direction and watch of Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas, the 2022 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) the Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed.

141.   Under the direction and watch of Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) the Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed.

142.   The 2022 and 2023 Proxy Statements also failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds

from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

143.    In the exercise of reasonable care, Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of the Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas to the Board and the approval of the amendment to the Plan.

144.    In the exercise of reasonable care, Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth to the Board and the approval of the amendment to the Plan.

145.    The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) re-elect Defendants Wagenhals, Wallace, Markley, Goodmanson, Lockett, Childress, Urvan, Walker, and Tsentas to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance

thereunder by 1,000,000 shares.

146.    The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia*: (1) re-elect Defendants Wagenhals, Smith, Wallace, Lockett, Childress, Urvan, Walker, Tsentas, and Luth to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the amendment to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 3,000,000 shares.

147.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

148.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    The Individual Defendants, by virtue of their positions with Ammo and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ammo and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Ammo to engage in the illegal conduct and practices complained of herein.

151.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    The Individual Defendants participated in a scheme to defraud with the purpose and

effect of defrauding Ammo. Not only is Ammo now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ammo by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Ammo.

154.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

155.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ammo not misleading.

156.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Ammo.

157.    The Individual Defendants acted with scienter during the Relevant Period, in that

they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

158.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

159.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ammo's business and affairs.

162.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ammo.

164.    In breach of their fiduciary duties owed to Ammo, the Individual Defendants

willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company lacked adequate internal controls over financial reporting; (ii) due to the foregoing, there was a substantial likelihood that Ammo failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) due to the foregoing, there was a substantial likelihood that Ammo failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) due to the foregoing, there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

165.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

166.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

167.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

168.    The Individual Defendants had actual or constructive knowledge that the Company

issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ammo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

173.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ammo.

175.    The Individual Defendants either benefitted financially from the improper conduct and their making insider sales, or received profits, bonuses, stock options, or similar compensation from Ammo that was tied to the performance or artificially inflated valuation of Ammo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

176.    Plaintiff, as a shareholder and representative of Ammo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

180.    In addition, the Individual Defendants caused the Company to repurchase millions

of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

181.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

182.     Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Abuse of Control

183.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ammo, for which they are legally responsible.

185.     As a direct and proximate result of the Individual Defendants' abuse of control, Ammo has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.     Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## EIGHTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

187.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ammo in a manner consistent with the operations of a publicly held corporation.

189.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ammo has sustained and will continue to sustain significant damages.

190.     As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

191.    Plaintiff, on behalf of Ammo, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Wagenhals, Smith, and Wiley for Contribution Under Sections 10(b) and 21D of the Exchange Act

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    Ammo and Defendants Wagenhals, Smith, and Wiley are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Wagenhals's, Smith's, and Wiley's willful and/or reckless violations of their obligations as officers and/or directors of Ammo.

194.    Defendants Wagenhals, Smith, and Wiley, because of their positions of control and authority as officers and/or directors of Ammo, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ammo, including the wrongful acts complained of herein and in the Securities Class Action.

195.    Accordingly, Defendants Wagenhals, Smith, and Wiley are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.    As such, Ammo is entitled to receive all appropriate contribution or indemnification from Defendants Wagenhals, Smith, and Wiley.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ammo, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Ammo;

(c)     Determining and awarding to Ammo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ammo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ammo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Ammo to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Ammo restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Date: November 8, 2024                    Respectfully Submitted,

1

2
                          **MARTIN & BONNETT PLLC**

3
                          */s/ Jennifer Kroll*

4
                          Susan Martin
Jennifer Kroll

5
                          4647 N. 32nd Street, Suite 185
Phoenix, AZ 85018

6
                          Telephone: (602) 240-6900

7

8
                          **THE BROWN LAW FIRM, P.C.**

9
                          Timothy Brown (*pro hac vice* forthcoming)
767 Third Avenue, Suite 2501

10
                          New York, NY 10017
Telephone: (516) 922-5427

11
                          Facsimile: (516) 344-6204

12
                          Email: tbrown@thebrownlawfirm.net

13
                          *Counsel for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint